U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed September 30, 2012**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-RLJ-11 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| WALTER O'CHESKEY, Liquidating Trustee | § | |
| of the AHF Liquidating Trust, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 11-02006-RLJ |
| | § | |
| HOUSING FOR TEXANS CHARITABLE | § | |
| TRUST, D/B/A HOUSING FOR TEXANS | § | |
| FOUNDATION, SCOTT D. RICE, | § | |
| INDIVIDUALLY, AND SCOTT D. RICE | § | |
| AND CONNOR RICE, AS CO-TRUSTEES | § | |
| OF THE 2001 SCOTT D. RICE TRUST, AND | § | |
| AHF DEVELOPMENT, LTD., | § | |
| | § | |
| DEFENDANTS. | § | |

## <u>MEMORANDUM OPINION</u>

The Court issues its Findings of Fact and Conclusions of Law in this adversary

proceeding. Trial was held January 23, 2012 to January 25, 2012. Upon the approved stipulation of the parties, on February 13, 2012, the Court received and admitted into evidence exhibits admitted at the hearing on the motion for substantive consolidation held in the *AHF Development, Ltd.* case [Case No. 09-20703-11]. The evidence was thereby closed and the matter was taken under advisement.

The Court will refer to the parties as follows: the debtor, American Housing Foundation, will be referred to either as "AHF" or the "Debtor"; the plaintiff, Walter O'Cheskey, the appointed and acting trustee for the AHF Liquidating Trust, will be referred to as the "Trustee"; defendant Scott D. Rice will be referred to as "Scott" or "Scott Rice"; the 2001 Scott D. Rice Trust will be referred to as the "Rice Trust"; Scott Rice and the Rice Trust may collectively be referred to as "Rice"; and defendant AHF Development, Ltd. will be referred to as "AHF Development."

## I. FINDINGS OF FACT

### A. Main Bankruptcy Case

1.      On April 21, 2009, certain alleged creditors of AHF filed an involuntary petition against AHF pursuant to chapter 11 of the Bankruptcy Code, thereby initiating the involuntary case [Case No. 09-20232] against AHF. On June 11, 2009, the Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code, initiating a voluntary case [Case No. 09-20373].

2.      On July 17, 2009, the Court entered its *Agreed Order Granting Motion to Consolidate Bankruptcy Cases* [Docket No. 88; Case No. 09-20232], consolidating the voluntary case and the involuntary case into a single case pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure.

3.    On April 29, 2010, the Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 1104; Case No. 09-20232].

4.    On December 8, 2010, the Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1918; Case No. 09-20232], confirming the *Second Amended Joint Chapter 11 Plan Filed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* [Docket No. 1909; Case No. 09-20232].

**B.    Adversary Proceeding**

5.    On February 28, 2011, the Trustee filed the *Liquidating Trustee's Complaint to Avoid Guaranty as Fraudulent Obligation, to Subordinate Allowed Claims, and to Avoid and Recover Fraudulent and Preferential Transfers, Together with Objections to Claims* [Docket No. 1, Adversary No. 11-02006],[1] thereby initiating this adversary proceeding against the Defendants.[2] [Trustee's Exhibit 100].

6.    On September 6, 2011, the Trustee filed the *Liquidating Trustee's Motion for Entry of Default Judgment Against Defendant Housing for Texans Charitable Trust, D/B/A Housing for Texans Foundation* [Docket No. 15].

---

[1]Additional docket references refer to Adversary No. 11-02006, unless otherwise noted.

[2]The complaint was filed against all defendants in the above captioned adversary: Housing for Texans Charitable Trust, d/b/a Housing for Texans Foundation, Scott D. Rice, individually, and Scott D. Rice and Connor Rice as Co-Trustees of the 2001 Scott D. Rice Trust.  Since filing the complaint, the Trustee has entered the *Liquidating Trustee's Motion for Entry of Default Judgment Against Defendant Housing for Texans Charitable Trust, D/B/A Housing for Texans Foundation* [Docket No. 15]. In his *First Amended Answer of Defendants Scott D. Rice, Individually, and Scott D. Rice and Connor Rice as Co-Trustees of the 2001 Scott D. Rice Trust* [Docket No. 18], Rice waived and disclaimed any right or interest in regard to Housing for Texans Foundation.

7.      On October 7, 2011, the *First Amended Answer of Defendants Scott D. Rice, Individually, and Scott D. Rice and Connor Rice as Co-Trustees of the 2001 Scott D. Rice Trust* [Docket No. 18] was filed, in which Rice waived and disclaimed any right or interest in regard to Housing for Texans.

### C.      Background Facts

8.      Scott Rice's parents acquired properties in New Mexico, first in 1956 and then in 1969. They acquired approximately 285 acres (the "New Mexico Lands"). A portion of the New Mexico Lands were used for the "Brush Ranch Camp" for girls, which was later opened-up to both girls and boys. In addition to running a camp on the New Mexico Lands, his parents also started a boarding school for boys and girls.

9.      In 1977, Scott Rice's father, who had been running the camp, stepped away from the camp and focused his efforts on the boarding school. As a result, Scott Rice and his wife, Kay, began running the camp. Scott Rice had worked at the camp since 1972.

10.     Scott Rice's father, who served as the "Head Teacher" for the school from 1990 to 1996, died in 1996. The school then had a headmaster that was not a member of the family who served until 2001. Scott Rice's wife, Kay, ran the school thereafter, reporting to the board of directors for the school.

11.     Scott's parents had established a trust for the benefit of Scott and his sister, Catherine. Upon the advice of their CPA, Steve Sterquell, they transferred the New Mexico Lands into a trust, which, apparently upon the death of both his parents, was divided into two trusts—(1) the 2001 Scott D. Rice Trust (which, as set forth, is referred to herein as the "Rice Trust") and (2) the Catherine B. Rice Trust. Scott Rice and Steve Sterquell were co-trustees of

- 4 -

the Rice Trust, with Scott Rice as the sole beneficiary of the Rice Trust. Scott testified at trial that as between the two trusts, they were split on a 60/40 basis, with his interest being the 60% interest.

12.     In 2002, Catherine accused Steve Sterquell and Scott Rice of mismanaging the parents' trust, which led to a lawsuit that was filed in 2003. This was settled in 2004 with Scott Rice buying out Catherine's interest. The Rice Trust therefore became owner of the entirety of the New Mexico Lands which constituted the principal assets of the trust. To fund this settlement, the Rice Trust obtained a loan of over $1 million. Scott testified that he signed a note on behalf of the Rice Trust and that he understood the terms and conditions of the note and his obligation to the bank from which money was borrowed.

13.     In January of 2005, the decision was made by the board to close-down the school, as it was experiencing financial difficulties. At such time, deposits had been made by students for the upcoming school year. Apparently the deposits had already been expended and thus Scott and Kay borrowed approximately $400,000 from Davos Capital, LLC to use in refunding the deposits that had been made. Scott and Kay Rice pledged a 286-acre tract that they owned at the time (not the New Mexico Lands) as collateral for the $400,000 loan. *See* Trustee's Exhibit 108. Scott Rice characterized the refunding of the deposits as a gift to the school and not a loan. The school closed in May 2005.

14.     Scott Rice and his son, Connor Rice, are presently co-trustees of the Rice Trust. Prior to Connor Rice becoming a trustee, Steve Sterquell and Scott Rice served as co-trustees from 2001 until Steve Sterquell's death, purportedly by suicide, in April 2009.

15.     In addition to the relationship arising from the Rice Trust, Scott Rice served as a

director with Steve Sterquell of AHF for over ten years, from 1998 until Steve Sterquell's death

in April 2009. As a director, Scott Rice regularly attended board meetings and was thus provided

with financials for AHF. He stated that he did not read the financial information and, further, that

he did not understand the financials.

### D. The Rice Trust's Proofs of Claim

16. The Rice Trust filed a proof of claim in the AHF bankruptcy case on September

30, 2009, as an unsecured claim for "[m]oney loaned" of $382,197.12. *See* Trustee's Exhibit 101.

The claim represents the net of four loans made totaling $1,157,930.00, beginning October 5,

2005, and payments of $775,732.88, beginning April 25, 2005. The repayments began before the

initial "loan." *Id*.

17. The September 30, 2009 claim was amended on November 19, 2010, to assert a

claim for $3,677,718.03 for "constructive trust and fraud claims." Trustee's Exhibit 102. The

proof of claim states that Steve Sterquell, acting as co-trustee of the Rice Trust and as a principal

of AHF and AHF Development (of which AHF was the general partner), "abused and breached

his fiduciary duty to the [Rice Trust] by fraudulently and wrongfully disposing of funds from the

Trust bank accounts to [AHF] and AHF Development, Ltd., for the benefit of [AHF]." *Id*. In

addition, the proof of claim asserts that AHF Development was a sham used by Steve Sterquell to

perpetuate a fraud against the Rice Trust for AHF's benefit. *Id*.

> To that end, Sterquell represented that he was making loans and investments of the
> Trust funds to safe vehicles with [AHF] and AHF entities that would earn interest and
> minimize liability. However, in reality, the funds were not placed in safe vehicles
> (loans or investments), but rather were comingled [*sic*] with other funds and used
> solely to cover operating expenses and pay the creditors of [AHF].

*Id*.

18.     The Rice Trust amended its claim a second time, on October 7, 2011, to reflect an unsecured claim of $787,900.00, again based on constructive trust and fraud claims. *See* Trustee's Exhibit 103. The proof of claim states as follows:

> Sterquell had a long professional history with the Rice family. Not only did he serve as a co-trustee of the Parents' Trust, but also as their CPA, giving financial and tax advice, preparing their state and federal income tax returns. After the parents died, Sterquell maintained this relationship with the [Rice Trust], serving as co-trustee along with Scott Rice, and in the professional capacity as CPA for the [Rice Trust] and for Scott and Kay Rice personally. He therefore owed a fiduciary duty to the Trust. . . . Acting in his capacity as the executive officer for [AHF], Sterquell abused and breached his fiduciary duty to the [Rice Trust] by fraudulently and wrongfully disposing of funds from the Trust bank accounts to [AHF], for the benefit of [AHF]. To that end, Sterquell, acting also as the executive officer for [AHF], represented to the co-trustee, Scott Rice, that he was making loans and investments of the Trust funds to safe vehicles with [AHF] that would earn interest and minimize tax liability. However, in reality, the funds were not placed in safe vehicles (loans or investments), but rather were comingled [*sic*] with other funds and used solely to cover operations and pay creditors of [AHF]. Therefore, [AHF] was unjustly enriched by Sterquell's fraudulent and wrongful dispositions of [Rice Trust] funds.

*Id*. In effect the claim arises from disbursements ostensibly caused by Steve Sterquell from the Rice Trust to AHF specifically (and thus not including disbursements to AHF Development) of $1,157,900, less payments made by AHF to the Rice Trust and Scott Rice of $370,000, resulting in the net claim of $787,900. *See id*.

**E.     Investments by and Distributions to Scott Rice/the Rice Trust**

19.     The Rice Trust generated the funds used to invest in and make distributions to AHF and AHF Development from basically two sales, the so-called "Cox Sale" in 2005 and the "Lujan Sale" in 2007; these two sales made up the Rice Trust's disposition of the New Mexico Lands that had originally been placed in the parents' trust by Scott Rice's parents. The Cox Sale in 2005 generated proceeds of $3,218,248; the 2007 Lujan Sale generated proceeds of

$3,122,536. *See* Trustee's Exhibit 106.

20.     After the two sales, the Rice Trust was left with approximately twelve acres on which Scott Rice and his wife, Kay, have their home, a barn, a shop, and a storage building.

21.     Scott Rice entrusted the Rice Trust funds with Steve Sterquell, who was to invest the funds in a way that, as Scott described it, would maximize his return and minimize the taxes. Scott described these investments with Sterquell as both loans and investments; he was uncertain how to characterize them.

22.     Of the proceeds realized from the sales of the New Mexico Lands and "managed" by Sterquell, $1,157,000 went to AHF; $3,692,536 to AHF Development; and $1,600,000 to an individual named Matt Malouf. *Id*.

23.     During the time frame of late 2005 to late March 2005, distributions were made *to* Scott Rice principally and the Rice Trust from the accounts of AHF Development and AHF. Of the transfers made *to* the Rice Trust or Scott Rice, $370,000 was ostensibly made from AHF's account, and a total of $2,928,473—$2,768,473 to Scott Rice and $160,000 to the Rice Trust—was made from AHF Development's account. *Id*.

24.     Within 90 days prior to the AHF bankruptcy filing—January 21, 2009 to April 21, 2009—Scott Rice received distributions from the AHF Development account of $175,000; for the period of 90 days to one year before the filing—April 21, 2008 to January 20, 2009—he received distributions from the AHF Development account of $592,741; for the period of one year to two years before the filing—April 21, 2007 to April 20, 2008—he received distributions from the AHF Development account of $575,000, and from an AHF account of $75,000; for the period of two years to four years before the filing—April 21, 2005 to April 20, 2007—he received

- 8 -

distributions from the AHF Development account of $1,425,732 and from the AHF account of $75,000. The total of transfers from the AHF Development account to Scott Rice personally was, therefore, $2,768,473, and from the AHF account $150,000, for a total of $2,918,473. *See* Trustee's Exhibit 106.

25.     The Rice Trust did not receive distributions from either the AHF Development account or the AHF account within the year prior to the filing. For the period of one year to two years before the filing, it received $30,000 from AHF; for the period two years to four years before the filing—April 21, 2005 to April 20, 2007—it received $160,000 from the AHF Development account and $190,000 from the AHF account. The total transfers to the Rice Trust were, therefore, $380,000. *Id*.

26.     The total transfers to both Scott Rice and the Rice Trust from the AHF Development account were $2,928,473 ($2,768,473 to Scott Rice and $160,000 to the Rice Trust); the total to both Scott Rice and the Rice Trust from the AHF account was $370,000 ($150,000 to Scott Rice and $220,000 to the Rice Trust). *Id*.

27.     The transfers were made by wire transfer on mostly a monthly basis and mostly in $50,000 increments. *Id.* The payments stopped in early 2009, at the time of Steve Sterquell's death.

28. A summary of the Scott Rice and Rice Trust transfers (transfers in and transfers out) is set forth on the following chart:

**Rice Trust Ranch Sale Proceeds:**

| | |
|---|---|
| 2005 Ranch Sale Proceeds............... | $3,218,248 |
| 2006 Ranch Sale Proceeds............... | 199,295 |
| 2007 Ranch Sale Proceeds............... | 3,122,536 |
| | $6,540,079 |

**Rice Trust Ranch Proceeds Transferred to:**

| | |
|---|---|
| AHF.................................................. | $1,157,000 |
| AHF-D............................................. | 3,692,536 |
| Malouf.............................................. | 1,600,000 |
| | $6,449,536 |

**AHF Repayments/Transfers to:**

| | |
|---|---|
| Scott Rice......................................... | $150,000 |
| Rice Trust......................................... | 220,000 |
| | $370,000 |

**AHF-D Repayments/Transfers to:**

| | |
|---|---|
| Scott Rice......................................... | $2,768,473 |
| Rice Trust......................................... | 160,000 |
| | $2,928,473 |

| | |
|---|---|
| **Total Transfers to Scott Rice/Rice Trust** | **$3,298,473** |

As is apparent, all the investment funds going *in* were from the Rice Trust, while the bulk of the funds coming *out* were *from* AHF Development and *to* Scott Rice.

**F.      The Bogus Loan to Housing for Texans Charitable Trust**

29. On March 25, 2009, at 9:03 p.m., Steve Sterquell sent an email to Scott Rice confirming a phone conversation of that same day to the effect that "we are going to move your investment to a secured loan that pay [*sic*] you $30,000 a month. It will be secured by the four medical buildings that are leased to Covenant Health Systems through the Sisters of St. George."

- 10 -

Trustee's Exhibit 300.

30.    By a promissory note dated December 31, 2008, Housing for Texans Charitable Trust promised to pay the Rice Trust $4.5 million "or, if less, the aggregate unpaid principal amount of advances made by Lender to Borrower pursuant to this Note," plus interest at 8%. Trustee's Exhibit 306. The note was payable on demand or, if no demand made, interest payments were to begin May 1, 2009, with the entire principal balance and accrued interest due in full on March 31, 2012. *Id*.

31.    Steve Sterquell delivered this note to Scott Rice in March 2009. *See* Trustee's Exhibit 307. Rice did *not* make a loan to Housing for Texans Charitable Trust, however. On March 26, 2009, a Pledge Agreement was entered into between Housing for Texans Charitable Trust and the Rice Trust, which purports that Housing for Texans Charitable Trust pledges "its partnership interest in Saint George Partners, Ltd. to [Rice Trust]." *Id*. Scott Rice signed this instrument in late March 2009. *Id*.

32.    These two documents, the Promissory Note and the Pledge Agreement, represent a purported loan transaction and offer Scott Rice his explanation of the transformation of his investments into loans. Scott Rice was not aware of Housing for Texans Charitable Trust, however, and neither he nor the Rice Trust, to his knowledge, ever made a loan or an investment in such entity. Despite this, by letter dated April 28, 2009, Scott Rice, as trustee of the Rice Trust, made demand on Housing for Texans Charitable Trust for payment of a $4.5 million promissory note. *See* Trustee's Exhibit 308.

G.    **The Rice Trust's Tax Deductions**

33.    For 2005, the year of the Cox Sale, the Rice Trust had total income of $3,841,161,

which included the Cox Sale of $3.2+ million; it claimed deductions of $3,887,478. *See* Trustee's Exhibit 204. The Rice Trust therefore had no taxable income in 2005. *Id*. Of the deductions, $3.5 million were based on a charitable donation of $400,733 to the Brush Ranch School and a pass-through charitable donation deduction from "Amarillo PC II, Ltd." in the amount of $3,116,068. *Id*. This charitable donation deduction is reflected on a K-1 issued by the limited partnership. *Id*. Scott Rice testified at trial that he made no inquiry regarding the charitable donation and admitted that he did not know what it was based on.

34.     For 2007, the year of the Lujan Sale, the Rice Trust had capital gain income of $2,768,243, but claimed an ordinary business loss of $3.122 million; it, therefore, had no taxable income as a result. *See* Trustee's Exhibit 215. The loss deduction was passed through from WI-TOB, Ltd., a limited partnership in which the Rice Trust purportedly held a 99.99% interest. *Id*. According to the Schedule K-1 issued by the partnership, the Rice Trust contributed $3,122,536 to the partnership in 2007 and the Rice Trust's share of losses was $3,122,224. *Id*.

35.     In 2006, the Rice Trust filed its tax return reflecting total income of $387,359, which, after deductions, resulted in *no* taxable income. The deductions included a charitable deduction of $227,699. *See* Trustee's Exhibit 210. This deduction was passed through to the Rice Trust from Amarillo GT II, Ltd., to which, according to a K-1 issued by the partnership, the Rice Trust had made a capital contribution of $201,876. *Id*. According to the K-1, the Rice Trust held a 3.33% interest in Amarillo GT II, Ltd. *Id*. (In addition to the two major sales, the Cox Sale and the Lujan Sale, the Rice Trust also realized $199,295 on a sale in 2006).

36.     Stephen C. Coen was a testifying expert on behalf of the Trustee. Coen is an attorney, presently in a private practice that emphasizes tax representation. Prior to entering private practice in 1996, he was an attorney with the Internal Revenue Service, in the Office of

the Chief Counsel, and had a concurrent appointment as Special Assistant United States Attorney, specializing in bankruptcy. Coen testified regarding his opinion of the propriety of the tax deductions taken in connection with the Rice Trust's investments in Amarillo PC II, Ltd., made in 2005, in WI-TOB, Ltd., in 2007, and in Amarillo GT II, Ltd., made in 2006. *See* Trustee's Exh. 402.[3] Upon his review, he concluded that, to the extent business losses or charitable donations were made, such losses or donations were not real and hence the deductions claimed as a result were not legitimate. Scott Rice did not dispute these conclusions. Scott contends that, at the time, he did not know or understand that they were not proper. Coen further concluded that through these and other transactions, Steve Sterquell was engaged in perpetrating abusive tax shelter deals. He further concluded that Scott Rice was on inquiry notice given his involvement in and acquiescence to the tax deductions he took and that, as a result, he should have obtained advice from an independent expert concerning the validity of the deductions. The Internal Revenue Service would, according to Coen, likely impose a penalty on Rice for illegitimate tax deductions as a result.

### H. AHF/AHF Development Ponzi Scheme

37. The admitted evidence includes the transcript with exhibits from the Court's hearing held on March 4, 2011, on the issue of whether the AHF and AHF Development bankruptcy cases should be substantively consolidated. *See* Trustee's Exhs. 700–725. Also at issue was the U.S. Trustee's motion seeking dismissal of the AHF Development case. Upon the evidence presented, the Court dismissed the AHF Development case. *See* Trustee's Exh. 502

---

[3]The Court overrules the objection to Coen's Expert Report, Trustee's Exhibit 402, and admits Trustee's Exhibit 402.

(copy of Court's Memorandum Opinion). As the Court noted, the testifying expert, Harry Potter,

concluded that AHF and AHF Development was being run by Steve Sterquell as a Ponzi scheme.

*Id*. at 12; *see also* Trustee's Exh. 512 (Potter's Expert Report). Though the Court determined

that dismissal of AHF Development was required, it also concluded that, based on the evidence,

AHF Development was "nothing more than a conduit bank account" for AHF. Trustee's Exh. 502

at 24.

38.     In the Memorandum Opinion, the Court stated as follows:

Potter concluded that AHF and Development were dominated by Steve Sterquell and
that their financial affairs are hopelessly entangled; that AHF and Development,
because of Steve Sterquell, failed to follow recognized corporate formalities. Potter
concluded Development was a sham in the sense that developers' funds were placed
into a bank account owned by Development and thus contrary to investors'
understanding that such funds were to be used for one of AHF's projects.
. . .
Potter concluded that Development and AHF were effectively one entity and should
be consolidated. He testified that the books and records of each entity were in terrible
condition, that there was massive commingling of funds, and that the accounting
practices were "unusual" at best. He testified that reconciling several thousand
transfers would be time consuming, expensive, and essentially impossible. He
explained the reconciliation process requires that one look at the substance of a
transaction over its form. That is to say, one must look beyond merely the recording
of debits and credits in a transaction and analyze the purpose of a transfer in order to
accord it proper characterization. According to Potter, there were basically four
purposes for the funds transferred into Development and that were subsequently
transferred out of Development. The funds went back to AHF, to Steve Sterquell
personally, to pay bills on behalf of AHF, or for "Ponzi"-like payments to investors
in the AHF enterprise. Potter concluded that Sterquell was carrying-on a Ponzi
scheme; Potter defined a Ponzi scheme as a "phony investment plan in which monies
paid by later investors are used to pay artificially high returns to the initial investors,
with the goal of attracting more investors."
. . .
In the few years prior to the bankruptcy filing, Development conducted no business
operations and provided no goods or services from which a receivable can arise.
Potter concluded that in excess of $140 million passed through Development.

Trustee's Exh. 502 at 11–12, 24. Apart from Potter's conclusions, the Court has independent

- 14 -

evidence of many millions of dollars having passed through AHF Development in the form of Ponzi payments. *See* Trustee's Exhs. 600–609.

39. Potter's conclusion that Steve Sterquell was orchestrating a Ponzi scheme through AHF and AHF Development is credible. The Rice transactions as set forth herein are included within the transactions reviewed by Potter in reaching his conclusion. The Court likewise finds and concludes that Steve Sterquell did indeed operate a Ponzi scheme through AHF and, more particularly, AHF Development, and that the Rice transactions were indeed a part of the Ponzi scheme.

I. **Other Relevant Facts**

40. As for the Rice Trust returns for the years 2005 through 2007, Scott Rice, in his testimony, disavowed any knowledge of the basis for the deductions or, in effect, the Rice Trust's tax returns. He said he left all such matters up to Steve Sterquell including, apparently, any personal knowledge of the Rice Trust's ultimate tax liability. This, despite being the sole beneficiary of the Rice Trust. Scott Rice's testimony is disingenuous. Scott Rice certainly knew the amount of proceeds realized each year from the sales of the New Mexico Lands and that such sales could create significant tax ramifications and obligations. He also understood the potential bottom-line impact to himself personally. He fully appreciated the bottom-line benefit derived from the large deductions that appeared on the tax returns—even if he had no expertise or knowledge of K-1s. He must be saddled with understanding that a *loss* has meaning; he and the Rice Trust cannot be credited with the naïveté that is implicit in failing to appreciate that he received, in the same tax year, income of several million dollars and a mirrored loss of a comparable sum without appreciating the basic nature of the transactions.

41.     During these years, 2005 to 2007, Scott Rice and the Rice Trust (principally the former) were receiving monthly payments from the AHF and AHF Development accounts (principally the latter) of $50,000 to $100,000. Scott said these were interest payments. Despite this, neither Scott Rice nor the Rice Trust claimed this "interest" income for these years. Scott admitted that he considered the income "tax free" because Sterquell told him it was.[4]

42.     Scott Rice knew Steve Sterquell was moving money out of the Rice Trust; Steve Sterquell had authority to invest or loan the funds to AHF or AHF-related entities.

43.     Scott Rice testified that he understands the basic difference between an investment and a loan; he understands that one receives interest on a loan and that an investment is like purchasing an interest in a company or an asset. He testified that he authorized Steve Sterquell to take care of his money in a way that would maximize the return and minimize taxes.

44.     In his testimony, Scott Rice vacillated regarding the nature of the transactions concerning AHF and AHF Development. He described them as both loans and investments. The Rice Trust obviously claimed the tax deductions that flowed back to the Rice Trust as a result of the deals. He admitted that he never reviewed the AHF financials, which he received as a director, and he never attempted to determine how AHF or AHF Development treated his investments.

45.     AHF had a conflict of interest policy for its board members. Specifically, it required that its directors adopt and sign a Conflict of Interest Disclosure Statement. *See* Trustee's Exhibit 109. It was explained to the directors that it was very important and, given it concerned a non-profit entity established for a charitable purpose, the directors were, apart from

---

[4]The Rice Trust returns do reflect some interest income. The 2005 return reflects interest income of $302,038, Trustee's Exhibit 204; the 2006 return reflects interest income of $302,355, Trustee's Exhibit 210; and the 2007 return reflects interest income of $213,776, Trustee's Exhibit 215.

their salaries, prohibited from realizing a private gain. They were not to benefit personally from investments or interests in AHF. *Id*.

46.    Scott Rice attended college for three years, after which he traveled in Europe for several months. He then worked as a cook in Vail, Colorado for nine months before going back home to New Mexico in 1972 to work at the camp.

47.    In 1977, after Scott's father started focusing his efforts on the school as opposed to the camp, Scott and Kay were primarily responsible for managing the camp and its operations. The camp would generate $600,000 to $700,000 in revenues, and had over fifty employees at any one time. Scott was in charge of running the camp's "business." He filed its tax returns, which were prepared by the CPA, Steve Sterquell. He also prepared budgets and insured that the camp's expenses were paid. He and Kay maintained a line of credit at their bank that they accessed each September for the camp's operations.

48.    Before he inherited the New Mexico Lands and, particularly, up until he sold a portion of the land in 2005 on the Cox Sale, Scott never had an occasion to need an investment advisor. He had run the school and had a few loans, but he had not been involved in high-dollar investments.

49.    As stated above, Scott Rice's parents employed Steve Sterquell as their CPA and financial advisor. They were also good friends with Steve Sterquell and maintained a social relationship with him. Scott Rice's mother frequently played cards with Steve Sterquell and enjoyed his company.

50.    Steve Sterquell was instrumental in effecting the Cox Sale. He knew the purchaser, Cox, and was described as having served as the "mediator" for the negotiations that led to the

sale. Upon the Cox Sale, Scott turned over the proceeds to Sterquell for Sterquell to invest in a way that would accomplish his two goals of maximizing returns and minimizing taxes.

51. Scott Rice testified that the funds going into the AHF Development account were intended to be a "long term investment."

52. In February 2009, shortly before Steve Sterquell's death, Scott met with Sterquell because he had concerns about the economy and, as a result, specific concerns regarding his investments. Steve Sterquell gave Scott a spreadsheet that reflects "Advances" made by Scott, "Payments" to the Rice Trust, an interest rate, and a running "Principal Balance." Defendants' Exh. 12. The same document refers to a $3,122,536.17 balance in the "Walden I-TOB Investment" relating to the Lujan Sale and a $1,566,346.18 balance regarding the "Mezzanine Fund/Tax Exempt Fund (Cox Sale)." It refers to the total balance or investment of $4,890,662.52. *Id*. Upon receiving this "spreadsheet" and an explanation from Sterquell, Scott Rice's concerns were alleviated.

53. Scott Rice admitted that he first learned in May 2009 that Steve Sterquell was providing illegitimate tax deductions for investors; this was shortly after Sterquell's death in early April. Despite this, he had not, as of the time of trial, taken any specific action concerning the legitimacy of the deductions he took under his personal or the Rice Trust's tax returns.

54. Scott Rice did not know what Steve Sterquell was investing his funds in; he assumed he was taking care of his business. His desire was that he maximize his return with minimum tax exposure. Despite this, Scott Rice has sufficient business experience and experience with obtaining and being obligated on loans to fully understand the basic difference between loans and investments.

## II. CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

1.      The Court has jurisdiction over this complaint and the causes of action asserted herein under 28 U.S.C. §§ 157(a) and (b) and 1334.

2.      The causes of action asserted herein are core proceedings under 28 U.S.C. § 157(b). In the event a superior court determines that some or all of the causes of action here are not core proceedings subject of the Court's jurisdiction, these findings and conclusions are submitted as proposed findings and conclusions. *See* 11 U.S.C. § 157(c)(1) and *Stern v. Marshall*, --- U.S. ---, 131 S. Ct. 2594(2011).

3.      Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.  Characterization of the Rice Deals[5]

4.      The Rice transactions were wildly beneficial to Scott Rice. To summarize from the facts, Scott Rice, in return for entrusting his $6+ million inherited wealth with Steve Sterquell, received the following benefits:

- instant tax-free distributions of $50,000 to $100,000 per month, aggregating over $3.2 million, over the course of just over three years with the expectation, apparently, that the distributions would continue indefinitely;

---

[5] As stated above, the Court refers to Scott Rice and the Rice Trust collectively as "Rice." This is particularly the case in discussing the nature of the *Rice* deals or transactions. As is apparent from the facts, there was no distinction between the two concerning the investments made by the Rice Trust and distributions made predominately to Scott Rice. Scott Rice personally benefitted from the distributions. The parties did not specifically address this factual anomaly, presumably because it is of no substantive effect.

- aggregate charitable and business-loss tax deductions of approximately $6.46 million, which deductions reduced, in each year, the taxable income realized from the sales of the inherited properties (essentially, the Cox Sale and the Lujan Sale); and

- as evidenced by the proofs of claim filed by Rice, the promise or obligation on AHF's part to repay the amount invested (though Rice did net-out the payments received against the amount invested and did not, contrary to his testimony, take the position that the payments were merely interest payments which, if so, would have left the full amount of the "principal" amount intact).

5.       The Rice deals are not grounded in economic reality. The same dollars—the $6+ million from the Cox and Lujan Sales—generated, almost simultaneously, loss and charitable deductions *and* generous returns. Plus, regardless of what Steve Sterquell actually did with Rice's money, Scott Rice certainly appreciated how great these deals were. The Court is convinced that tax consequences were foremost in Scott Rice's mind upon realizing his windfall. Scott Rice was clearly looking to not only minimize but *eliminate* any resulting taxes.

6.       The Rice transactions have characteristics of both investments and loans. The monthly distributions from AHF to Rice make it appear that Rice's money was loaned to Sterquell (and by association, AHF). The claimed tax deductions by Rice obviously indicate the deals were pure investments; in fact, according to the Rice tax returns, Rice acquired defined limited partnership interests in entities affiliated with AHF.

7.       These deals are such that they simply defy definition, which is the very reason they

- 20 -

are called into question. The Bankruptcy Code addresses real claims—secured, priority, administrative, unsecured—and equity interests. It does not have a category for strange, hybrid-type arrangements as exist here. Unless the Rice deals are part loan and part equity, they must be characterized as one or the other. The benefits to Scott Rice from his investments, as set forth above, far exceed what he put in. The Court cannot conclude from the facts—the relatively contemporaneous investments by Rice and distributions back to Rice along with the tax deductions—that they are part loans and part equity. Given the issues raised, the Court must characterize the Rice deals as either loans or equity in order to achieve the dictates of the Bankruptcy Code.

8.      The Court looks to Texas state law to determine whether the Rice transactions are investments that create, at most, an equity claim or debt subject to treatment as an unsecured claim. *See* 11 U.S.C. § 502(b); *see also In re Lothian Oil, Inc.*, 650 F.3d 539 (5th Cir. 2011). In this regard, Texas courts have looked to the multi-factored tests from federal tax law cases. *Lothian*, 650 F.3d at 544. These include a 16-factor test as set forth in *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968); a 13-factor test from *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972); and an 11-factor test from *Jones v. United States*, 659 F.2d 618, 622 n.12 (5th Cir. 1981).

9.      As with other factor-driven tests, the Court reviews the evidence in light of all factors, "while realizing that the various factors are not of equal significance and that no one factor is controlling." *Lothian*, 650 F.3d at 544 (quoting *Mixon*, 464 F.2d at 402). Additionally, the various factors "are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of

the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty*, 398

F.2d at 697.

> 10.     Factors considered are the following:
>
> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Id.* at 696. Yet additional factors are the name of the instrument, if any, memorializing the deal,

*Mixon*, 464 F.2d at 402, and the right to enforce payment of principal and interest, *Jones*, 659

F.2d at 622 n.12.

11.     On a more basic level, the Court notes that creditors and investors are

distinguishable in the way they each view the solvency or insolvency of the enterprise with which

they are dealing. *In re Deep Marine Holdings, Inc.*, No. 10-03116, 2011 WL 160595, *5 (Bankr.

S.D. Tex. Jan. 19, 2011). For example, if the enterprise prospers, a creditor expects nothing more

than repayment of its fixed debt. *Id.* In fact, the creditors rely on the *equity* provided by the

company's investors. *Id.* at *6. Investors, however, look to share in the profits to the exclusion of

creditors. *Id.* at *5. The flip side of this expectation is the enhanced risk of insolvency borne by

investors. *Id.* The subordination provisions of the Bankruptcy Code, both § 510(b) (mandatory

subordination of damage claims arising from purchase of a security) and the absolute priority rule

set forth at § 1129(b) of the Bankruptcy Code (providing that "unsecured creditors stand ahead of

investors in the receiving line and their claims must be satisfied before any investment loss is compensated," *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009)), are said to arise from these basic expectations and, thus, the very nature of investments compared to loans. Accordingly, the risk of the illegality in issuance of equity is properly borne solely by investors because "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors." *Deep Marine*, 2011 WL 160595 at *6 (quoting *SeaQuest*, 579 F.3d at 420).

12.     Apart from the evidence and the flow of funds—from Rice to AHF/AHF Development and from AHF/AHF Development to Rice—and the Rice Trust tax returns, there are no documents that identify the exact nature of Scott Rice's dealings with Steve Sterquell.

13.     A critical factor is "the intent of the parties" involved in structuring the transaction. *See In re Lane*, 742 F.2d 1311, 1315 (11th Cir. 1984) (quoting *Byerlite Corp. v. Williams*, 286 F.2d 285, 290 (6th Cir. 1960)) ("[T]he decisive factor [in differentiating equity from a loan] is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties."); *Geftman v. Comm'r of Internal Revenue*, 154 F.3d 61, 68 (3d Cir. 1998) ("*In the absence of direct evidence of intent*, the nature of the transaction may be inferred from its objective characteristics") (emphasis added). Intent should be determined at the time of the transaction. *Geftman*, 154 F.3d at 69. Scott Rice and Sterquell intended for Scott Rice to have a secure equity position in AHF in which he would be paid generous payments indefinitely as long as AHF kept thriving.

14.     The identity or relationship between the contracting parties is likewise an

important factor. If the parties do not negotiate at arm's length, a court should be wary of them

trying to "mold" a transaction into a financially amorphous product that can conveniently be either

a loan or an investment. *See Fin Hay*, 398 F.2d at 697. Here, Scott Rice and Sterquell were

accountant and client, financial advisor and client, trustee and beneficiary, friends, and both on the

board of AHF. As "even extensive objective evidence [of a formal loan agreement] may be

insufficient to establish the existence of a debt where [there is a] close relationship between the

transferor and the transferee," the Court is wary of allowing Scott Rice to claim that he was

loaning money to Sterquell and reap the benefits of being a debt holder in bankruptcy without any

formal documentation or other convincing evidence of a loan. *Geftman*, 154 F.3d at 73.

      15.    Another factor concerns the amount of capital the recipient had at the time of the

transaction. If the recipient was capitally thin, then the transaction weighs towards an equity

investment. *See Jones*, 659 F.2d at 622; *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 751 (6th

Cir. 2001). This factor is difficult to assess. AHF was a non-profit entity that sat at the top of an

enterprise that included over sixty for-profit companies or partnerships. Many of the deals

orchestrated by Steve Sterquell are complex and, like the Rice deal, legally questionable. The

Court can safely assume that AHF was capitally thin.

      16.    The "risk involved" in the transaction considers the presence or lack of security.

Absence of any security is a "strong indication that the advances were capital contributions rather

than loans." *See AutoStyle Plastics*, 269 F.3d at 752. Scott Rice obtained no security when he

plunged his life's savings into AHF. Though Sterquell may have promised repayment and

sufficiently assuaged any concerns Scott Rice may have had, the solvency of AHF was the only

thing backing any such promise. Given this appetite for risk-taking, it suggests Scott Rice was

investing in, instead of lending money to, AHF.

17.　　The arrangement's formal indicia is particularly relevant here. Where there is an "absence of debt instruments, collateral, interest provisions, repayment schedules or deadlines, book entries recording loan balances or interest payments, actual repayments, and any other attributes indicative of an enforceable obligation to repay the sums advanced," the transaction is probably not a loan. *Geftman*, 154 F.3d at 68 (citing *Fin Hay*, 398 F.2d at 696). Here, there were repayments arguably based on an interest factor but no fixed maturity date. The lack of maturity date on an instrument suggests an equity investment. *See Lane*, 742 F.2d at 1316.

18.　　Unpapered deals between co-directors, involving millions of dollars, instant and generous returns, and huge tax write-offs are, by any objective standard, questionable. Scott Rice, however, chose not to question what Sterquell was doing with his money. For example, in response to the Trustee's counsel's question of whether tax-free $50,000 per month payments should have been a red flag, Scott simply responded as follows: "Mr. McCartin [Trustee's counsel], this was a time in my life where I had more money than I had ever had in my life. And we were very happy. We were building, remodeling the house. And it was a very exciting time. And I knew that I was getting money monthly. And that satisfied me." Doc. No. 89 at 142. Several times during the trial, Scott testified that his simple investment goals as relayed to or expected of Sterquell were to maximize his return and minimize his taxes. Realizing both such goals to the extent he did here was simply not realistic. From the perspective of legitimate creditors of AHF, the inherent risks associated with such questionable deals should lie exclusively with the one that blindly followed Steve Sterquell's lead.

19.　　Scott Rice's money was ostensibly used for the purchase of limited partnership

- 25 -

interests through which he ultimately received large tax deductions. Under both the factor-driven analysis set forth above and given the generally questionable nature of the transactions, the Court can only conclude that Rice's investments created at most an equity interest in AHF or affiliates of AHF.

###### C.  Subordination of the Rice Claim

20.  Having characterized Rice's interest as, at most, an equity interest in AHF and/or affiliates of AHF, the analysis of Rice's "claim" is simplified. Rice's proof of claim states on its face that it is based on constructive trust and fraud. Its addendum includes a claim for breach of fiduciary duty. Rice's claim does not arise under a debt instrument with a definite principal sum, repayment terms, and interest. It can only be a claim for damages arising from an equity interest. Such claim, by the clear wording of § 510(b) must be subordinated. *See* 11 U.S.C. § 510(b). Subordination serves the purpose of preventing disappointed equity holders from recovering their investment loss by using fraud and other securities or tort-based claims to "bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *Deep Marine*, 2011 WL 160595 at *6 (quoting *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002)). "[A]llowing equity-holders to become effectively creditors—by treating these two classes as though they were one—gives investors the best of both worlds: a claim to the upside in the event the company prospers and participation with creditors if it fails." *In re Geneva Steel Co.*, 281 F.3d 1173, 1176 (10th Cir. 2002).

###### D.  Distributions as Fraudulent Transfers

21.  The illicit nature of the Rice transactions which, in part, provides the basis for the recharacterization of Rice's claim, likewise supports the Trustee's fraudulent transfer cause of

action under § 548 of the Bankruptcy Code. Rice invested over $6 million with Sterquell and

received, in addition to regular $50,000 tax-free monthly distributions, over $6 million in tax

deductions from charitable donations made (as in 2005 by Amarillo PC II, Ltd.) or losses incurred

(as in 2007 by WI-TOB, Ltd.). Rice reaped the benefit of these deductions.

22.     Just as Scott Rice arguably should have known that his deals were "too good to be

true," the Court can fairly infer that Steve Sterquell *did know* that they were too good to be true.

Sterquell promised, or at least created an expectation from either a gullible or naive individual in

Scott Rice, that his "investments" would create an unimaginable panoply of benefits: generous,

unending returns and huge tax deductions, with no risk that AHF's liability (for the amount

invested) was in question. Sterquell promised more than he could possibly deliver. It was, on

balance, an illegitimate deal that fueled Scott Rice's desire to maximize his return and, in effect,

eliminate taxes. It is a form of a Ponzi scheme. Findings ¶¶ 37–39.[6] It burdened AHF with far

more than it could legitimately deliver, all to the detriment of AHF's real creditors.

23.     Ponzi schemes, as a matter of law, satisfy the actual intent requirement of

§ 548(a)(1). *See In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 536 (9th Cir. 1990); *see

also Sec. & Exch. Comm'n v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007). The bad

actor is the transferor—the debtor. "The only inquiry concerning actual intent that matters is that

of the debtor: whether the debtor causing the transfer or incurring the obligation intended to

hinder, delay or defraud its creditors." 5 *Collier on Bankruptcy* ¶ 548.04[3][a][2] (Alan N.

---

[6]A Ponzi scheme is defined as follows: "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors." *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1332 n.1 (10th Cir.1996) (citing *Sender v. Heggland Family Trust (In re Hedged–Invs. Assocs., Inc.)*, 48 F.3d 470, 471 n.2 (10th Cir.1995)).

Resnick & Henry J. Sommer, eds., 16th ed. 2012). As has further been noted in *Colliers*, Ponzi or Ponzi-like schemes raise equitable concerns. *Id.* at ¶ 548.04[3][c]. The typical defendants/transferees are likewise victims of the scheme. *Id.* "Asking victims to turnover money paid to them by the debtor may seem like adding insult to injury. It is a proper application of the law, however, that the Trustee may avoid the entire transaction." *Id.* Here, this includes the entire $3+ million transferred to Rice. The real inquiry, then, is whether Rice has a defense under § 548(c).

### E. Rice's § 548(c) Defense

24. Section 548(c) allows a defense to the extent value is given and was done so in good faith. *See* 11 U.S.C. § 548(c). The elements of good faith and value turn on the facts of each case. *Collier on Bankruptcy*, ¶ 548.04[3][c]. As to value, most cases involving Ponzi schemes recognize that investors have themselves been defrauded by the debtor and correspondingly have a right of rescission for their original and subsequent investments that is extinguished dollar for dollar for each receipt back. *Id.* Rice's proof of claim nets out transfers against the amount he invested; Scott Rice does not assert a claim for the entire amount of his investment, which would be the case if the transfers to him and/or the Rice Trust constituted a return or interest on his investment.

25. With respect to Ponzi schemes, the Eleventh Circuit in *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011), stated as follows:

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal. Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment. Thus, any transfer up to the amount of the principal

> investment satisfies the investors' fraud claim (an antecedent debt) and is made for
> "value" in the form of the investor's surrender of his or her tort claim. Such payments
> are not subject to recovery by the debtor's trustee. Any transfers over and above the
> amount of the principal—i.e., for fictitious profits—are not made for "value" because
> they exceed the scope of the investors' fraud claim and may be subject to recovery by
> a plan trustee.

*Id*. (internal citations omitted). The *Perkins* court rejected the argument made there that the general rule—that value is given by the investor up to the amount of the investment—should not apply where the investors hold only an equity interest in an insolvent debtor as opposed to a situation involving defrauded investors that hold "claims against the instrument of the fraudulent scheme either in tort law or through some sort of contractual arrangement." *Id*. at 627–28. The court held that "[t]he general rule applies in a Ponzi scheme setting regardless of whether good faith investors have an equity interest in, or some other form of claim against, the legal entity constituting the instrument of the fraud." *Id*. at 628–29. The Eleventh Circuit's holding in *Perkins* is in accord with the general notion, as expressed by the Fifth Circuit in *In re Hannover Corp.*, 310 F.3d 796 (5th Cir. 2002), that §§ 548(a) and (c) are complementary. "The first section affords creditors a remedy for the debtor's fraudulence or, as the case might be, mere improvidence; the second protects the transferee from his unfortunate selection of business partners." *Hannover*, 310 F.3d at 802.

26.      Resolving whether Scott Rice was acting in good faith is a difficult determination. As stated, Scott Rice was driven by a desire to avoid taxes on his riches. Scott Rice certainly was complicit with Sterquell in this regard. He never questioned the vast riches and benefits he received. Scott Rice's culpability arises from his desire to avoid taxes. This aspect of the Rice deals, however, did not harm other creditors—or it can only be said to have harmed other

creditors to the extent it encouraged Scott Rice and perhaps others to invest with Sterquell. But

Sterquell (and by extension, AHF), the transferor, orchestrated the illegitimate tax deductions.

The fraud as to creditors as a whole, the § 548(a)(1) claim, arises from *Sterquell's* illicit scheme.

While this is an exceedingly close call, the Court cannot conclude that Scott Rice's complicity

regarding one aspect of these deals—the illicit tax benefits—defeats his good faith. Scott Rice

knew he was taking advantage of huge deductions, but he did not appreciate how the tax angle

may have lured other investors into Sterquell's scheme.

27.     The determination of whether a transferee has taken in good faith under § 548(c) is

based on an objective standard: what the transferee knew or should have known. A "transferee

who takes property with knowledge of such facts as would excite the suspicions of a person of

ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not

take the property in good faith." *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No.

3:09-CV-572-L, 2011 US Dist. LEXIS 3962, *16-17 (N.D. Tex. Jan. 13, 2011) (quoting *Hahn v.

Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Given the

unique nature of Ponzi schemes and the imputation of actual fraud as to all deals made in

furtherance of the scheme, it is necessary to compare the fault of the debtor/transferor with the

knowledge and fault, if any, of the transferee. Steve Sterquell was a trusted family friend and

adviser, a relationship that originated with Scott Rice's parents. Scott Rice was dependent on

Sterquell and was obviously deferential to him. Though Scott Rice served as a director of AHF

and ostensibly had the opportunity to inquire of AHF's activities, it is also apparent that Sterquell

totally controlled and manipulated AHF and its activities. It is an understatement to describe the

AHF activities and Steve Sterquell's use of AHF as complicated. AHF was a non-profit entity at

the top of a pyramid that included over sixty other for-profit entities, all of which were being

operated and used by Steve Sterquell. Gaining any real substantive understanding of what was

truly happening for someone of Scott Rice's experience level was unlikely. In addition, Sterquell

was a co-trustee of the Rice Trust. As between Scott Rice and Steve Sterquell in their respective

capacities as co-trustees and co-directors, Steve Sterquell was clearly the dominant and

controlling person. Having given due consideration to all facts and circumstances, the Court

concludes that Scott Rice maintains his good faith defense.

28.     As the amount of Rice's investments ($4,849,536) well exceed distributions to

Rice ($3,298,473), Rice's § 548(c) defense defeats the Trustee's avoidance claim. As the Court

recognizes and gives credit for Rice's investments that were ostensibly made into *both* the AHF

and AHF Development accounts, it is not addressing Rice's contention that transfers *from* AHF

Development are not properly at issue.[7]

29.     As the Court has determined that Rice's claim is recharacterized and then

subordinated under § 510(b), and that his § 548(c) defense resolves the Trustee's fraudulent

transfer causes of action, it is not necessary to address the remaining issues raised by the parties.

30.     The issues raised in this matter involve mixed questions of fact and law.

Accordingly, where appropriate, findings of fact may be considered conclusions of law and

conclusions of law may be considered findings of fact.

---

[7]The Court notes that it finds that the AHF Development account was a conduit bank account for AHF. *See* Finding ¶ 37. In addition, the Court concludes, without discussion, that this issue resolves in the Trustee's favor. The Court reserves the right to issue additional findings and conclusions on this issue, if necessary.

### End of Memorandum Opinion ###