

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

Signed November 07, 2012

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-RLJ-11 |
| | § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| WALTER O'CHESKEY, Liquidating Trustee of the AHF Liquidating Trust, | § § § | |
| PLAINTIFF, | § § | |
| VS. | § | ADVERSARY NO. 11-02006-RLJ |
| | § | |
| HOUSING FOR TEXANS CHARITABLE TRUST, D/B/A HOUSING FOR TEXANS FOUNDATION, SCOTT D. RICE, INDIVIDUALLY, AND SCOTT D. RICE AND CONNOR RICE, AS CO-TRUSTEES OF THE 2001 SCOTT D. RICE TRUST, AND AHF DEVELOPMENT, LTD., | § § § § § § § § | |
| DEFENDANTS. | § § | |

**SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court issues its Supplemental Findings of Fact and Conclusions of Law to the

Memorandum Opinion entered September 30, 2012 [Docket No. 91] to further address the Trustee's preference claim under § 547 of the Bankruptcy Code.

## I. SUPPLEMENTAL FINDINGS OF FACT

1. Alan L. Weiner testified as an expert concerning AHF's solvency at the time of the transfers to Rice. Weiner holds a Bachelor of Science degree from the University of Florida and a Masters of Business Administration from the Wharton School at the University of Pennsylvania. Weiner has worked as an investment banker in the syndication of affordable housing projects; he has three years experience in the health care business and six years experience in the home building business. He is presently a principal of Focus Management Group. Focus is based out of Tampa, Florida; it is described as a "national turnaround/crisis management company, which provides consulting and management services to companies in financial duress." Focus was retained by the Trustee to assist him in connection with the bankruptcy proceedings of AHF and, in particular, in preparing and obtaining confirmation of a chapter 11 plan. After confirmation, Weiner served as president of the Reorganized AHF and as a financial advisor to the Trustee in his capacity as liquidating trustee under the confirmed chapter 11 plan.

2. Weiner has had greater involvement and hands-on management experience with AHF during the AHF bankruptcy proceeding than any other person. He has intimate knowledge of AHF's hugely complicated structure, as well as its bewildering array of transactions. Weiner is familiar with the many properties involved in the AHF enterprise and the means by which such properties were used by AHF (and Steve Sterquell) in promoting its "affordable housing" deals.

3. AHF is a non-profit entity that was created by Steve Sterquell to serve at the head of the "affordable housing" enterprise that consisted of properties that were, for the most part,

owned by for-profit entities that AHF either owned, directly or indirectly, or controlled. Steve Sterquell was the mastermind of the entire enterprise.

4. Specifically, AHF was involved with 65 housing complexes, each owned by a separate affiliate of AHF; there were three categories of properties. First, there were thirteen conventionally financed properties, each owned by one of the affiliates—mostly limited liability companies—of which AHF served, directly or indirectly, as controlling member. These properties were financed with an approximate $25 million credit with JP Morgan, guaranteed by AHF. Second, there were seventeen properties owned by seventeen affiliated limited partnerships, referred to as "tax credit properties"; the partnerships "sold" tax credits to third party investors who participated in the ownership of the limited partnerships by owning approximately 99% of the respective partnerships as limited partners. AHF or another AHF-affiliated entity served as general partner. As part of the tax credit financing, AHF issued guaranties to investors. These were not run of the mill guaranties, however. The guaranties often included an operating deficit guaranty, a tax credit delivery guaranty, a tax credit recapture guaranty, a repurchase guaranty, and a guaranty that an applicable real estate tax exemption would be maintained. The total of the tax credit investor claims were approximately $27 million. These properties were also encumbered by mortgage debt that was not guaranteed by AHF.

5. The third group of properties were the so-called "tax exempt bond finance" properties. These were likewise owned by limited liability companies, of which AHF was the sole member. They were commonly referred to as the "Walden" and "Simpson" properties, consisting of eleven "Walden I" properties, seventeen "Walden II" properties, and four "Simpson" properties; there were three additional properties in this category. These properties were likewise

burdened by large mortgage debt.

6. In addition to its equity interests in the 65 affiliates, AHF owned two other properties, the so-called "Lakewood Terrace" and the "San Patricio" properties.

7. To arrive at a fair value of AHF's assets, Weiner had to assess both its real and personal property assets as well as AHF's intangible equity interest in the 65 affiliated entities. AHF's ownership interests were, relatively speaking, the major asset base of AHF.

8. In determining a value of AHF's equity interests for purposes of AHF's solvency, Weiner assessed the relative values of the properties held by such entities which, by necessity, required an analysis of the financing and debt structure of the properties involved and of the convoluted financing schemes employed by Steve Sterquell (and AHF) to attract investors. In arriving at his conclusions, Weiner relied upon his particular expertise and in-depth knowledge of the properties and the various financing methods; he employed traditional valuation concepts, as well. For example, he applied a discounted cash flow analysis with a capitalization rate to achieve values for the properties held by the affiliated entities.

9. The liabilities side of the ledger for AHF was no less complicated. AHF's greatest potential exposure arose from the contingent liabilities that likely were to arise from the many guaranties that it was obligated on by virtue of its complicated financing arrangements on the various properties. These obligations flowed up to AHF as the guarantor. Weiner had to opine on AHF's likely exposure resulting from the guaranties.

10. Weiner concluded that, for the years 2004 through 2008, AHF's total liabilities exceeded the value of its assets and thus was insolvent for such time frame.

11. For the end of 2008, Weiner concluded that the fair value of AHF's assets was

approximately $6.275 million and the value of its liabilities, including its many guaranties, exceeded $89 million. The assets do *not* include the approximate $24 million in life insurance proceeds on the life of Steve Sterquell that was recovered through litigation prosecuted by certain investors for the benefit of the AHF bankruptcy estate. Weiner concluded that the life insurance policies, as term policies, were, prior to Steve Sterquell's death, of no real measurable value to AHF. The $24 million arose from the death benefits under the policies.

12. Weiner was vigorously and effectively cross-examined by counsel for Rice concerning the valuation methods he employed for the real property held by the affiliated entities. In this regard, Weiner employed a high capitalization rate of 8 to 10%, a rate higher than what would typically be employed by an outside real estate appraiser. He was also somewhat influenced by his knowledge of the current conditions, which led to a charge of hindsight bias.

13. On balance, the Court finds Weiner's testimony and opinions regarding AHF's insolvency for the year prior to the bankruptcy filing of AHF to be credible and helpful to the Court. The insolvency analysis was an exceedingly difficult task given the complexities of AHF's structure and the nature of its operations and transactions. Any method of valuation of AHF's equity interest is subject to second guessing. Weiner is the one person most familiar with AHF, its finances and operations, and the condition of the properties. Weiner's education, experience, and hands-on knowledge of the AHF enterprise made him especially qualified to address AHF's solvency. Weiner was obviously employed by the Trustee and thus, as with any expert, could be charged with being less than totally objective. This charge does not, however, undermine his basic conclusions.

14. Steve Sterquell ran AHF as part of an elaborate Ponzi scheme; Steve Sterquell

knew of AHF's likely demise. AHF's financial circumstance—its insolvency—grew worse as Sterquell's scheme played out. AHF was insolvent for the period from one year prior to the filing of AHF's petition, April 21, 2008, to the filing date of April 21, 2009. In addition, for the period of ninety days prior to the filing—from January 21, 2009 to April 21, 2009—AHF's insolvency is presumed and was not rebutted. *See* § 547(f).

## II. SUPPLEMENTAL CONCLUSIONS OF LAW

1. The Trustee contends that funds paid from the AHF Development account were property of AHF. *See* Memorandum Opinion, Findings of Fact No. 28, for a summary of payments made from the AHF Development account. The Court has determined that AHF Development was nothing more than a conduit bank account for AHF. *See* Findings of Fact No. 37. Rice argues that AHF Development, as a limited partnership, cannot under Texas law serve as AHF's conduit. This argument flows from the principle that the partnership "veil" cannot be pierced under Texas law and, without piercing, AHF Development, as an entity, cannot be relegated to a mere conduit.

2. The question here is not one of veil piercing; it is a question of whether the funds paid out of the AHF Development account were property of AHF. A "piercing" analysis concerns, in the traditional sense, the imposition of liability on, for example, a corporation's controlling shareholder for the wrongful acts of the corporation; for reverse piercing, liability is imposed on the corporation for the wrongful acts of the shareholder. *See, e.g., Kern v. Gleason*, 840 S.W.2d 730, 736 (Tex. App.—Amarillo 1992, no writ). ("It is established that although a corporate entity may be the alter ego of an individual or the individual may be the alter ego of the corporation, these facts do not create a separate cause of action against the corporation or the

individual. The piercing of the corporate veil is not a separate cause of action but a means of imposing individual liability where it would not otherwise exist.") (internal citations omitted); *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) ("Piercing the corporate veil, after all, is not itself an action; it is merely a procedural means of allowing liability on a substantive claim [such as a] breach of contract."). Traditional piercing is not applicable in the partnership context as the injured party can recover from the general partner under partnership law. The claim here does not attempt to impose liability on or to compromise another party's property on account of the actions of another entity or person but, instead, looks to determine who actually owns the property (the funds here) under applicable state law. The rationale that prevents the piercing of a partnership does not extend to the claim made by the Trustee; the Trustee stands in the shoes of an injured creditor, asserting that the transferred funds were actually the de facto property of the debtor. *See De La Pena Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255, 259–60 (5th Cir. 2012).

  3. Resolving whether the debtor had an interest in property transferred—fraudulently (§ 547) or preferentially (§ 548)—requires that the court determine the "nature of the debtor's interest in the transferred asset under applicable state property law" and "whether [that] state-law defined property interest becomes 'property of the estate' under the Bankruptcy Code." *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 434 (Bankr. S.D. Tex. 2009), *affirmed by Stettner v. Smith (In re IFS Fin. Corp.)*, 669 F.3d 255. In the bankruptcy court's opinion in *IFS Financial*, the court began its analysis by noting that it was "faced with the situation where an account is legally in the name of one entity but effectively controlled by an individual for the benefit of the entities he controls and directs." *IFS Fin.*, 417 B.R. at 434. The court noted that under Texas law,

legal title does not always determine the true owner. *Id.* at 435 (citing *Silsbee State Bank v. French Mkt. Grocery Co.*, 132 S.W. 465, 466 (Tex. 1910); *Cohen v. Ulz (In re Ulz)*, 388 B.R. 865, 868 (Bankr. N.D. Ill. 2008)). With respect to a bank account, the bankruptcy court noted further that the Texas Supreme Court had found that the "true owner of funds in an account is not necessarily the legal owner, but the party who 'is found in the full possession and control of the money deposited.'" *IFS Fin.*, 417 B.R. at 435 (citing *Silsbee State Bank*, 132 S.W. at 466). The court therefore found that the plaintiff there could, as an alternative to piercing the third party's corporate veil, reach property by establishing that the property actually belonged to the debtor instead of the third party. In the second part of the two-part test, the bankruptcy court set about to determine whether the property was property of the estate. The court found "control" to be the most important factor in determining whether property that was *de jure* property of another entity was in fact the *de facto* property of the estate. In reaching this conclusion, the court relied primarily on two cases involving commingled funds, *Floyd v. Shindler (In re Rodriguez)*, 204 B.R. 510, 515 (Bankr. S.D. Tex. 1995), and *Southmark v. Grosz (In re Southmark)*, 49 F.3d 1111, 1116–17 (5th Cir. 1995). *IFS Fin.*, 417 B.R. at 434–35. The debtors in such cases had commingled funds into accounts held by separate entities and used the accounts to pay-off the debtors' creditors. Both the *Rodriguez* court and the *Southmark* court found that money transferred within third party accounts was property of the estate because it was controlled by the debtor, though held in the name of the other entity.

4. The bankruptcy court in *IFS Financial* assessed whether the debtor used its control over the assets of the third party account to routinely pay off creditors. The court stated as follows:

> [W]hether the debtor had "unfettered discretion to pay creditors of its own choosing, including its own creditors . . . is . . . the primary consideration in determining if funds are property of the debtor's estate ...").
> . . .
> If the debtor determines the disposition of funds from the third party and designates the creditor to be paid, the funds are available for payment to creditors in general and *the funds are assets of the estate*. In this event, because the debtor controlled the funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of preference law *whether or not she actually owns it*.

*IFS Fin.*, 417 B.R. at 435 (quoting *Southmark*, 49 F.3d at 1116–17, and *Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 350 (5th Cir. 2008)).

    5.    Both the district court and the Fifth Circuit affirmed the bankruptcy court in *IFS Financial*. The Fifth Circuit found that Texas law allowed the property of the debtor to be "anything that may be subject to [the debtor's] ownership." *IFS Fin.*, 669 F.3d at 262 (quoting Tex. Bus. & Com. Code Ann. § 24.002(2),(10)). Under an avoidance action analysis, deciding whether property was subject to the debtor's ownership could be determined by the debtor's control of such property. Specifically, the Fifth Circuit held that "control [of property] *may* be sufficient to show ownership in what is ultimately a fact-based inquiry that will vary according to the peculiar circumstances of each case." *Id*. (emphasis added). Indeed, legal title may be "irrelelevant" in determining whether or not the debtor had a property interest in an account. *Id.* at 263. Both the bankruptcy court and the Fifth Circuit in *IFS Financial*, relying on *Southmark*, looked first to whether the account was used to pay the debtor's creditors at the "unfettered" discretion of the debtor, thus "diminish[ing]" the pool to pay other creditors. *IFS Fin.*, 669 F.3d at 262–63 (citing and quoting *Southmark*, 49 F.3d at 1116–17). Whether the debtor has committed fraud in connection with the diversion of funds is likewise important. The Fifth Circuit adopted a sliding scale as to how much weight it would accord legal title and legal boundaries

based on the fraud of the debtor: "[w]here . . . evidence of fraud and the debtor's strict control are both strong, disputed legal ownership is less compelling. On the other hand, where evidence of fraud is weak, legal ownership might weigh heavier in our calculus." *Id.* at 264.

6. Where, as here, the general partner is the debtor and the limited partnership (or an account named after the limited partnership) is asserted to be the conduit, such conclusion cannot be based solely on the general partner's "control" as a general partner. After all, the general partner of any limited partnership controls the limited partnership. *Billings v. Key Bank (In re Granada, Inc.)*, 156 B.R. 303, 308 (D. Utah 1990). *IFS Financial* and other courts have emphasized this point. *See IFS Fin.*, 669 F.3d at 263 n.4 ("The general principle that a parent company's ownership of a subsidiary does not equate to absolute control over that subsidiary—thus, precluding the mechanical conclusion that assets belonging to the subsidiary may satisfy the debts and liabilities of the parent—is not absolute."); *Gordon v. Westside Bank & Trust Co. (In re Combs)*, 190 B.R. 979, 980–81 (Bankr. N.D. Ga. 1995) ("If the Court were to adopt Plaintiff-Trustee's reasoning and find that [defendant] was a conduit, then most closely held corporations could be said to be mere conduits in similar situations where they receive a transfer from a sole or majority shareholder. The Court is unwilling to so readily disregard the corporate form, especially as in this instance where Plaintiff-Trustee has failed to allege, let alone establish, any facts which would persuade the Court to do so."); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375–76 n.5 (Bankr. S.D.N.Y. 1998) (criticizing a proposed interpretation of conduit analysis that would "permit any person who controls another entity (*e.g.*, controlling shareholder of a nonwholly-owned subsidiary, general partner of a partnership) to recover the controlled entity's

transfers.").

7. As *Billings* suggested, for standing to recover transfers from the ostensible legal property of a partnership or subsidiary that the debtor controlled, the trustee needs to show "persuasive reason[s]" why the court should take the step of finding that property legally owned by a partnership was controlled by the debtor and became, in fact, the property owned by the debtor. *See Billings*, 156 B.R. at 308. *IFS Financial* specified what some of these persuasive reasons could be in addressing a corporate parent and subsidiary; specifically, where there is evidence both of fraud and the debtor's strict control, "disputed legal ownership is less compelling." *IFS Fin.*, 669 F.3d at 264. Indeed, as here with AHF and AHF Development, where fraud, tightly related entities, complex schemes, and bankruptcy all converge, there is often a distortion of *de facto* vs. *de jure* ownership.

8. It is critical to determine whom the debtor is defrauding. A debtor is the *de facto* owner of an account where the account was routinely and almost exclusively used by the debtor to pay-off the debtor's, not the third party entity's, creditors. *See IFS Fin.*, 669 F.3d at 262–63 (citing *Southmark*, 49 F.3d at 1113–17). This makes sense, as "[a] debtor's interest in property 'is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'" *IFS Fin.*, 417 B.R. at 434 (Bankr. S.D. Tex. 2009) (citing *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990)). As the Fifth Circuit and the Northern District have recognized, what drives the analysis is whether property was used by the debtor to pay its creditors:

> If the debtor determines the disposition of funds from [a] third party and designates the creditor to be paid, the funds are available for payment to creditors in general and the funds are assets of the estate. In this event, because the debtor controlled the

funds and could have paid them to anyone, the money is treated as having belonged to her for purposes of [avoidance] law whether or not she [technically] owns it.

*Southmark*, 49 F.3d at 1117 n.17 (citing 1 David G. Epstein et al., Bankruptcy § 6–7, at 522 (1992)); *see Venturelink Holdings, Inc. v. Kirkpatrick & Lockhart, L.L.P.*, No. 3:05-CV-2103-L, 2006 WL 2844121, *6 (N.D. Tex. Oct. 2, 2006) (In a conduit analysis, the "relevant inquiry is not who actually made the [disputed transfer] or whether the money ever transferred [came out of specific] accounts, but whether the original instruction [to pay a creditor] [came from the debtor]."). If funds from a bank account, ostensibly foreign to the debtor, are used by the debtor to pay its creditors and is done so in part fraudulently, the creditor pool, championed by the trustee, is harmed, which supports standing. *See Begier*, 496 U.S. at 59 (cited by *IFS Fin.*, 417 B.R. at 434 ("'[T]he purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate' so that all creditors receive the same, equitable, pro rata distribution."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (injury and redressability are key components of standing).

9. AHF Development did not benefit by having had the funds pass through an account under its name. The AHF Development bank account was used as a conduit through which the funds passed in payment of AHF's creditors. There is no evidence, within the time frame under consideration, that AHF Development had any independent business activities. Scott Rice and the Rice Trust were treated interchangeably by AHF (Steve Sterquell) and Scott Rice, as were AHF and AHF Development. Scott Rice was on the board of AHF and was a trustee of the Rice Trust. Early in the bankruptcy case, Rice contended that AHF and AHF Development should be treated as one—with their accounts pooled to satisfy creditor debts.

10. The Court concludes that funds transferred from the named accounts of AHF and

- 12 -

AHF Development constituted funds of the debtor, AHF.

11. For the period of one year prior to AHF's bankruptcy filing—April 21, 2008 to April 21, 2009—AHF transferred from the AHF and the AHF Development accounts to Rice and the Rice Trust the aggregate sum of $767,741.00. *See* Memorandum Opinion, Findings of Fact No. 24. Rice benefitted from the transfers and such transfers were made on account of an antecedent debt. *See Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *see also* Memorandum Opinion, Conclusions of Law No. 25. Rice was an insider of AHF. 11 U.S.C. § 101(31). AHF was insolvent when the transfers were made and, if allowed to stand, Rice would receive more than he (and the Rice Trust) would receive in a chapter 7 proceeding. Such transfers therefore constitute voidable preference payments under § 547(b) of the Bankruptcy Code.

### End of Supplemental Findings of Fact and Conclusions of Law ###